IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FIFTH DISTRICT

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

STATE OF FLORIDA,

        Appellant/Cross-Appellee,

                                     Case No. 5D15-1524

 v.

ANTHONY MARKIECE JACKSON,

        Appellee/Cross-Appellant.

_____/

Opinion filed November 10, 2016

3.850 Appeal from the Circuit
Court for Orange County,
Wayne C. Wooten, Judge.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Rebecca Roark Wall,
Assistant Attorney General, Daytona
Beach, for Appellant/Cross-Appellee.

Paula C. Coffman, Orlando, for
Appellee/Cross-Appellant.

COHEN, J.

The State appeals the order granting Anthony Markiece Jackson's motion for

postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850.[1] Jackson was

convicted of attempted first-degree murder with a firearm, robbery with a firearm, and

aggravated battery with a firearm, and sentenced to thirty years' imprisonment. The

_____

[1] Jackson cross-appeals only the summary denial of his "stand your ground" claim.
No appeal was taken from the summary denial of the other claims raised. We affirm the
summary denial of the "stand your ground" claim without further comment.

postconviction court vacated Jackson's sentence and ordered a new trial based on the ineffectiveness of Jackson's trial counsel. We reverse.

On the night of August 31, 2007, Jackson entered Arnold Felix's taxi cab and requested a short ride to a residential neighborhood. When the cab arrived at the destination, Jackson handed Felix a debit card for payment, but the card was declined. Felix's and Jackson's versions of what happened next differ. At trial, Felix claimed that when he informed Jackson that the card was declined, Jackson told him he had a second card. Jackson then sprayed Mace into his eyes. Felix reached into the back seat and grabbed Jackson, and Jackson shot him twice in the neck. Realizing he was shot, and fading in and out of consciousness, Felix pressed an emergency button in the cab to notify emergency responders. Jackson fled, taking with him Felix's wallet and cell phone, along with the keys to the cab.

Jackson testified that he had attended a high school football game earlier in the evening and had taken a gun for protection, along with a box of ammunition, Mace, and latex gloves.[2] After the game, Jackson went to Universal Studios and later decided to take a cab home. Jackson testified that the cab doors unlocked when the cab stopped at the destination, but that Felix locked the doors because his debit card was declined and Felix refused to allow him to leave.[3] He also testified that he had an additional credit card but claimed he never presented it to Felix because "it never crossed [his] mind." Jackson claimed Felix became aggressive, grabbed and choked him, and threatened to kill him.

---

[2] Jackson claimed, somewhat incredibly, that he needed the gloves because he had a cousin who dealt drugs.

[3] Felix testified that the doors automatically lock during the ride and are only unlocked after the fare has been collected.

Jackson acknowledged spraying Felix with Mace, which he claimed had no effect, and then shooting him. Jackson also testified that Felix told him he had called the police. Jackson claimed he heard the police approaching before he shot Felix. After Felix was shot, he fell on top of Jackson, and Jackson pushed him back into the front seat with a latex glove, allegedly because of Jackson's fear of blood.[4]

Jackson then unlocked the cab and fled. Jackson claimed that he took Felix's wallet by mistake—he believed he grabbed his own wallet—although his wallet was not left in the cab. He provided no explanation for taking Felix's cell phone or the keys to the cab. Jackson buried his bloodstained shirt and bandana, the latex gloves, the gun and ammunition, his and Felix's cell phones, and Felix's wallet in a yard in a residential neighborhood. He provided no explanation for burying the items.

At trial, Jackson's primary defenses were insanity and self-defense. Jackson was convicted as charged, and the jury further found that he discharged a firearm during the incident. The only issue Jackson raised on direct appeal was a claim of ineffective assistance of counsel. His convictions were affirmed without a written opinion. Jackson v. State, 36 So. 3d 688 (Fla. 5th DCA 2010). The mandate issued on June 16, 2010.

In 2011, Jackson filed a pro se motion for postconviction relief raising a variety of claims, including the alleged failure of counsel to present additional evidence to support his insanity defense. Subsequently, Jackson secured private counsel who filed an amended motion for postconviction relief more than two years after the mandate issued. The amended motion expanded on the previous claims and added a new allegation, claim J: that trial counsel was ineffective in raising an insanity defense that was not viable,

---

[4] The State's investigation revealed Felix's blood and tooth in the backseat of the cab, which was consistent with Felix being partially in the backseat when he was shot. Jackson's only injuries were scratches on his hand.

3

which opened the door to damaging testimony that effectively undermined his claim of self-defense. The postconviction court held an evidentiary hearing solely on the issue raised in claim J. The court granted Jackson's motion for postconviction relief, finding that Jackson's counsel was ineffective for raising the insanity defense because it was unsupported by the evidence and opened the door to damaging testimony.

Initially, the State argues that Jackson's rule 3.850 motion was procedurally barred. It contends that the issue of ineffective assistance of counsel was raised and decided in the initial appeal and is, thus, the law of the case. Yet, the scope of review on direct appeal differs from the scope of review for a rule 3.850 postconviction motion. A finding that Jackson did not show error apparent on the face of the record to obtain relief on direct appeal would not preclude a finding of ineffective assistance of counsel after an evidentiary hearing on a rule 3.850 motion. See Clarke v. State, 102 So. 3d 763, 764-65 (Fla. 4th DCA 2012); Allen v. State, 100 So. 3d 747, 748 (Fla. 2d DCA 2012).

The State also argues that claim J was untimely because it raised an entirely new claim more than two years after issuance of the appellate mandate. See Fla. R. Crim. Pro. 3.850(b) (requiring that a motion be brought within two years of the judgment and sentence becoming final absent exceptions). The motion for postconviction relief that was timely filed alleged that counsel erred in failing to present additional evidence in support of the insanity defense. Claim J took the opposite approach, claiming ineffective assistance of counsel in raising an insanity defense at the outset. Although the State's argument that the amendment was untimely appears to have merit, it is of no avail because the State did not raise the issue in the lower court.[5] Cf. Cook v. State, 638 So.

---

[5] The irony of the State's failure to raise this issue below in an ineffective assistance of counsel case is not lost on us.

2d 134, 135 (Fla. 1st DCA 1994) (concluding that State waived argument that claims were untimely by responding to every claim). Our review on appeal is limited to issues actually presented to and decided by the lower court. See Aills v. Boemi, 29 So. 3d 1105, 1109 (Fla. 2010).

As to the merits of Jackson's claim, the proper standard for attorney performance is that of reasonably effective assistance. In Strickland v. Washington, 466 U.S. 668, 687 (1984), the United States Supreme Court held that a defendant alleging ineffective assistance of counsel must prove both deficient performance of counsel and prejudice to the defendant. That is, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687. Jackson has the burden of establishing that but for the ineffective assistance of counsel, there was a reasonable probability that the result at trial would have been different. While deference is given to the postconviction court's factual findings that are supported by competent, substantial evidence, questions of law require de novo review. Graff v. State, 922 So. 2d 1058, 1059 (Fla. 5th DCA 2006) (citing Stephens v. State, 748 So. 2d 1028, 1033 (Fla. 1999)). Both prongs of the Strickland analysis present mixed questions of fact and law. Id.

Jackson was represented at trial by Shana Manuel, an Assistant Public Defender.[6] Manuel testified extensively at the evidentiary hearing, but her testimony was hampered by the fact that the Public Defender's Office lost Jackson's file. There is no doubt that Manuel made errors during her representation of Jackson. Manuel went out of her way at the evidentiary hearing to acknowledge those errors and to repeatedly opine that she had

---

[6] Manuel is no longer employed in that capacity.

5

rendered ineffective assistance of counsel in Jackson's case.[7] As the trial judge noted, however, an attorney's testimony is not dispositive of the issue. See Breedlove v. State, 692 So. 2d 874, 877 n.3 (Fla. 1997).

Central to the postconviction court's decision was its conclusion that Jackson's insanity defense effectively negated his claim of self-defense. The defenses of insanity and self-defense can be presented together if the evidence of insanity helps to explain why the defendant believed his or her life was in imminent danger. See, e.g., Martin v. State, 110 So. 3d 936, 939 (Fla. 1st DCA 2013); Wallace v. State, 766 So. 2d 364, 371 (Fla. 3d DCA 2000). The presentation of potentially inconsistent defenses becomes problematic, though, when the presentation of one defense effectively negates the other defense. But cf. Hannon v. State, 941 So. 2d 1109, 1139 (Fla. 2006) (finding no ineffective assistance of counsel for failure to present additional defense when that defense was inconsistent with defendant's primary defense).

In contemplation of presenting an insanity defense, Manuel initially had Dr. Jeffrey Danziger appointed to evaluate Jackson's mental health.[8] Dr. Danziger examined

---

[7] Manuel testified that the error she most regretted was allowing Jackson's family to influence her decisions. She testified that they pressured her to pursue an insanity defense, which clouded her judgment. Manuel stated that the family was in her office constantly, and they insisted that she present the insanity defense. However, the record demonstrates that Jackson was in regular communication with his family and acquiesced to the decisions made by Manuel. Jackson, in fact, requested Manuel to pursue the insanity defense.

[8] According to the record, Dr. Danziger was appointed pursuant to Florida Rule of Criminal Procedure 3.216, but this rule does not apply to defendants represented by the Public Defender's Office. Nevertheless, this Court has reasoned that the same attorney-client privilege created by rule 3.216 applies to all experts retained specifically to aid in the preparation of defense at trial. See Manuel v. State, 162 So. 3d 1157, 1160 (Fla. 5th DCA 2015) ("The rule contemplates that mental health experts appointed by the trial court for the purpose of determining the competency of indigent or partially indigent defendants are beholden to the attorney-client privilege. Although not expressly stated, the same

6

Jackson and prepared a report finding that "[Jackson] was sane at the time of the offense and it is my opinion he did not meet the insanity criteria." Later, when the State moved to have its own experts appointed to examine Jackson and included Dr. Danziger as one of those experts, Manuel did not object because she did not remember that Dr. Danziger had previously evaluated Jackson. The prior communication between Jackson and Dr. Danziger was protected by the attorney-client privilege, and Manuel should have objected to the State's appointment of Dr. Danziger as its expert.

At trial, Manuel introduced the insanity defense through the testimony of Dr. Charles English, a clinical psychologist. The postconviction court determined that, "Despite having no evidence of insanity, counsel decided to pursue an insanity defense which had no hope of succeeding and, in fact, led to damaging testimony against the Defendant." While it is true that Dr. English did not parrot the Florida legal standard for insanity, sometimes referred to as a modified M'Naghten standard,[9] Dr. English testified that Jackson "had a psychotic breakdown that caused him to believe the victim was going to kill him." He also testified that Jackson was delusional and was hallucinating at the time of the shooting. Dr. English opined that Jackson was temporarily insane at the time of the incident. While the State's experts disagreed with Dr. English, and the jury did not accept Jackson's insanity defense, the postconviction court's conclusion that no evidence of insanity was presented is not supported by the record.

---

must be true for experts privately retained for a similar purpose without the assistance of the trial court.").

[9] Under Florida law, the defendant must show that he or she suffers from mental illness, which caused the defendant either to not know what he or she was doing or to not understand that the conduct was wrong. § 775.027, Fla. Stat. (2007).

7

The State called Dr. Danziger to rebut Dr. English's testimony as a witness at trial. Manuel's only objection was to prohibit the State from mentioning that Dr. Danziger had originally been retained by the defense. Manuel did not object to the fact that Dr. Danziger's report was based on information gained during the course of a confidential interview. Dr. Danziger testified that Jackson said during the interview that he thought he could not leave the cab, and he realized the police were on the way. Jackson told Dr. Danziger that he knew he could be arrested and go to prison, so he tried to escape. He said he pulled the trigger after realizing he could go to prison for having a firearm. This version of events conflicted with Jackson's theory of self-defense. Manuel failed to protect Jackson's attorney-client privilege and as a result allowed damaging, confidential information to come into evidence. Manuel's failure to preserve Jackson's attorney-client privilege constituted deficient performance of counsel.

Additionally, there is evidence from the postconviction hearing that despite her years of experience, Manuel had an incorrect understanding of the burden of proof for the insanity defense. At the hearing, Manuel appeared unaware that the burden of proof for insanity is clear and convincing evidence. Manuel also testified that she believed a burden-shifting framework applied to the insanity defense, although she later clarified that she knew that insanity was an affirmative defense.[10]

Based on Manuel's failure to preserve Jackson's attorney-client privilege, and her misunderstanding of Florida law on insanity, we agree with the postconviction court that Manuel rendered ineffective assistance of counsel under the first prong of Strickland. The more difficult issue is whether Jackson established prejudice under the second prong of

_____

[10] At trial, Manuel stated in her closing argument that the burden was on the State to prove Jackson's sanity beyond a reasonable doubt.

8

Strickland, which requires Jackson to demonstrate that but for the ineffective assistance of counsel, there was a reasonable probability that the result at trial would have been different. 466 U.S. at 694. In evaluating the prejudice prong, this Court has a duty to conduct an independent review of the lower court's legal conclusions, without particular deference, to ensure the consistent application of constitutional principles across all appellate cases. See Stephens v. State, 748 So. 2d 1028, 1031-34 (Fla. 1999) (reaffirming an appellate court's duty to scrutinize conclusions of law in the context of ineffective assistance claims).

We find that Jackson did not establish prejudice because the evidence against him was overwhelming, and his claim of self-defense was internally inconsistent. To be justified in using deadly force, the person must "reasonably believe[] that . . . [deadly] force is necessary to prevent imminent death or great bodily harm to himself or herself." § 776.012(2), Fla. Stat. (2007). Jackson admitted that he got into the cab with a gun, a box of ammunition, Mace, and latex gloves. He claimed that Felix became so enraged over a ten-dollar fare that he locked Jackson in the car, and grabbed and strangled him— although Jackson also acknowledged that Felix told him he was going to call the police. Despite hearing the police sirens and knowing the police would be on the scene momentarily, Jackson nonetheless shot Felix and took his wallet, cell phone, and keys to the cab.

Jackson admitted that he fled the scene and that he buried the stolen items along with his bloody clothes, hoping that the items would never be discovered. He offered no explanation at trial for taking Felix's cell phone or the keys to the cab. We do not believe, given all of the incriminating evidence and the inconsistency between Jackson's stated

9

motivation and his actions, that there is a reasonable probability that a jury would find that Jackson's use of force was justified.

We understand the postconviction court's inclination to award Jackson a new trial based on the admitted ineffectiveness of his trial counsel, but Strickland requires Jackson to show that such errors prejudiced the result in this case. We have reviewed the record exhaustively and are unable to conclude, given the overwhelming evidence of guilt, that Jackson has met that burden. Thus, the court erred in vacating Jackson's conviction.

REVERSED and REMANDED for reinstatement of Jackson's conviction and sentence.

LAMBERT, J., and LEMONIDIS, R., Associate Judge, concur.